UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| XUAN KY, | No. CV 05-03716-SS |
| Plaintiff, | |
| v. | MEMORANDUM DECISION AND ORDER |
| JO ANNE B. BARNHART,<br>Commissioner of the Social<br>Security Administration, | |
| Defendant. | |

Xuan Ky ("Plaintiff") seeks review of the decision of the Commissioner of the Social Security Administration (the "Commissioner," "Defendant," or "Agency") denying her application for social security benefits.   The parties have consented to the jurisdiction of the undersigned United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c).   This matter is before the Court on the parties' Joint Stipulation that was filed on July 3, 2006.   For the reasons stated below, the decision of the Commissioner is AFFIRMED.

\\

\\

## PROCEDURAL HISTORY

Plaintiff previously received disability benefits.  On July 17, 1986, Plaintiff protectively filed an application for Supplemental Security Income ("SSI") benefits under Title XVI of the Social Security Act.[1]  (Administrative Record ("AR") 50).  Plaintiff alleged a disability onset date of sometime in 1970 on the basis of epileptic seizures and depression.  (AR 51).  On October 27, 1987, Plaintiff was granted SSI benefits effective July 17, 1986 for epileptic seizures and depression on a medical-vocational basis.  (AR 178-82).

On July 9, 1996, Plaintiff was notified that her disability had ceased as of July 1, 1996 due to medical improvement.  (AR 215).  This decision was affirmed by Administrative Law Judge ("ALJ") Lana H. Parke on March 12, 1998, after a hearing was conducted.  (AR 307-14).  ALJ Parke found that Plaintiff's seizures occurred approximately once every two months and did not prevent her from performing unskilled work at all exertional levels.  (AR 313).  Plaintiff did not appeal this decision.

On September 14, 1998, Plaintiff protectively filed the current application for Supplemental Security Income under Title XVI of the Social Security Act.  (AR 380).  Plaintiff again alleged that she became

\\

\\

---

[1]  Title XVI of the Social Security Act is codified at 42 U.S.C. §§ 1381-1385 ("Supplemental Security Income for the Aged, Blind, and Disabled").

disabled sometime in 1970 due to seizures and mental problems.[2] She also claimed that she was forgetful and could not sleep well. (AR 350).

The Agency denied her claim initially and upon reconsideration. (AR 294-302). Plaintiff then requested a hearing before an ALJ. (AR 303). A hearing before ALJ Parke was conducted on February 17, 2000, at which time Plaintiff appeared with counsel and testified in her own behalf. (AR 597-609). On May 22, 2000, ALJ Parke issued a decision denying benefits. (AR 283-290). Plaintiff sought review of this decision before the Appeals Council. (AR 11). On March 19, 2003, the Appeals Council remanded the case back to the ALJ for further review of the opinions of Dr. Minh N. Nguyen and Dr. Luzminda C. Lachica. (AR 326-328).

A hearing before ALJ Jan Donsbach was conducted on April 6, 2004. (AR 578-596). Petitioner again appeared with counsel and testified in \\

---

[2] While Plaintiff previously received disability benefits, those benefits were ceased on July 1, 1996 due to medical improvement. (AR 215). The cessation decision was affirmed by ALJ Parke on March 12, 1998. (AR 307-14). Because Plaintiff did not appeal the 1998 decision, Plaintiff is precluded from claiming disability for the period before March 1998. See Fair v. Bowen, 885 F.2d 597, 600 (9th Cir. 1989) (unless the prior decision is reopened, the plaintiff is precluded from claiming disability before the prior denial; earlier decision by ALJ denying benefits create a presumption that the plaintiff continues to be able to work; the plaintiff bears the burden of proving that her condition has worsened since the last denial by an ALJ).

In the current application, ALJ Parke specifically noted that any testimony taken regarding Plaintiff's condition prior to March 1998 was for "historical purposes only" and that there was no intention of reopening the prior decision denying benefits. (AR 286-87).

3

her own behalf.  A vocational expert also testified at the hearing and two medical experts testified over the telephone.

On June 18, 2004, ALJ Donsbach issued a decision denying benefits. (AR 17-30).  Plaintiff sought review of this decision before the Appeals Council.  (AR 15).  On March 24, 2005, the Appeals Council denied review and the ALJ's decision became the final decision of the Commissioner. (AR 9-14).  Plaintiff commenced the instant action on May 23, 2005.

**FACTUAL BACKGROUND**

**A. <u>Plaintiff's Medical History</u>**

Plaintiff is a Vietnamese woman with a ninth grade education and no past relevant work experience.  (AR 419, 593-94).  She was in several motorcycle and car accidents when she was younger.  Since then, she claimed that her seizures worsened and she suffered from multiple physical and mental problems.  (AR 500).  Plaintiff's attorney alleges that Plaintiff is unable to communicate in English.  However, Plaintiff testified that she spoke and understood some English.  (AR 593, 600).

From February 8, 2000 to March 2004, Plaintiff visited Dr. Minh Nguyen of the St. Albert Medical Clinic approximately fifteen times. (AR 522-75).  Plaintiff had regular visits about once a month for multiple complaints, such as dizziness, gastroesophageal reflux disease, and a history of seizures.  She has been prescribed Dilantin as an anti-seizure medication for many years.  (<u>See, e.g.</u>, AR 433, 458, 534, 553). Dr. Nguyen's progress notes consistently report Plaintiff's seizures as

stable on anti-epileptic medications.   (<u>See, e.g.</u>, AR 526, 529, 530, 535, 536, 550, 554, 567).


Dr. Nguyen submitted a "Medical Source Statement" regarding Plaintiff's physical residual functional capacity ("RFC") on January 11, 2000.  (AR 463-69).  Dr. Nguyen found that since 1987, Plaintiff was unable to sustain even sedentary work on a regular and continuing basis. (AR 463-469).  Dr. Nguyen indicated that Plaintiff could not sit, stand, or walk for more than one hour in an eight-hour workday.  He also stated that Plaintiff could not lift or carry more than five pounds for over one hour; could not reach, handle, or finger more than thirty minutes; and could not stoop, kneel, or crouch more than thirty minutes.  (AR 465-68).  Dr. Nguyen indicated that Plaintiff's car accidents caused her to have right hand numbness and weakness, seizures, and depression.  (AR 468).


Plaintiff has received mental health treatment from the Long Beach Mental Health Center ("Mental Health Center") from at least 1987.  (<u>See, e.g.</u>, AR 442-46, 474-85).  Plaintiff has returned roughly every month to the Mental Health Center to receive refills of her medication.  (AR 442-446).


A "Medical Source Statement" regarding Plaintiff's mental impairment was submitted from the Mental Health Center on January 19, 2000.  (AR 470-73).  This assessment found that Plaintiff was "markedly limited" in a number of areas, including her ability to understand and remember very short and simple instructions; perform activities within a schedule, maintain regular attendance and be punctual within customary

tolerances; make simple work-related decisions; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; and be aware of normal hazards and take appropriate precautions. (AR 470-72). The assessment found moderate limitations in many other areas of functioning. (Id.). However, the person completing this form cannot be identified.

Dr. Luzminda C. Lachica, a psychiatrist at the Mental Health Center, began treating Plaintiff in February 1999 for depression. (AR 516). Dr. Lachica's notes consisted mostly of medication logs. Progress notes from Dr. Lachica frequently noted improvement with medication and recommended that Plaintiff continue taking medications and attending group therapy. (See, e.g., AR 508, 509, 511, 513, 514).

Dr. Lachica stated in a letter dated August 22, 2002, that Plaintiff was diagnosed with Major Depressive Disorder, Recurrent, Severe, Without psychotic features; Panic Disorder With Agoraphobia; and chronic seizures. (AR 500). Dr. Lachica thought that Plaintiff's prognosis was guarded and that she could not be expected to work within the next twelve months. (AR 500).

In a letter dated February 13, 2004, and addressed to ALJ Donsbach, Dr. Lachica stated that Plaintiff was now diagnosed with Major Depression, Recurrent with Psychotic Features. Dr. Lachica thought that Plaintiff still was not able to work and that Plaintiff required more than twelve months to recover. Dr. Lachica noted that Plaintiff had

previously received Social Security benefits for about ten years and that she required "public assistance, cash and Medi-cal for her survival." (AR 501).

On March 23, 2004, Dr. Lachica completed a mental assessment, which consisted of check-off boxes. Dr. Lachica assessed Plaintiff with moderate limitations in many areas of functioning, including Plaintiff's ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others. (AR 517-19).

Dr. Lachica assessed slight limitations in other areas of functioning, including Plaintiff's ability to understand and remember very short and simple instructions; carry out very short and simple instructions; make simple work-related decisions; interact appropriately with the general public; and get along with coworkers or peers without distracting them or exhibiting behavioral extremes. (AR 517-18).

\\
\\

### B. Neurological Consultative Examination

On November 13, 1998, Plaintiff was examined by Dr. B.S. Subhas, a board certified neurologist, at the request of the Agency. (AR 415-417). Plaintiff reported having seizures about once a month since 1970. (AR 415). She also claimed to have been diagnosed and treated for mental problems since about 1985 and claimed to have episodes of hearing voices. (AR 415). Plaintiff further complained about feeling depressed, having impaired memory, and having poor sleep. (AR 416).

The neurological examination showed no abnormalities. Plaintiff's gross mental status and speech appeared normal, though some psychomotor retardation was noted at times; her cranial nerves were within normal limits; her motor and sensation examinations were normal; her cerebellar examination was within normal limits; her neck was supple; and her back was grossly normal. (AR 416).

### C. Psychological Consultative Examination

On November 13, 1998, Dr. Betty Borden, a clinical psychologist, also examined Plaintiff for a psychological consultation. (AR 418-22). Plaintiff claimed that she could not work because of her seizures. Although she was involved in outpatient counseling at the Mental Health Clinic, Dr. Borden noted that Plaintiff had never been psychiatrically hospitalized. (AR 418). Dr. Borden also observed that Plaintiff's presentation was inconsistent. For example, while Plaintiff remembered her social security number, she claimed that she could not recall five digits read to her. (AR 418).

During the mental status examination, Plaintiff was observed to be alert, oriented to person, and articulate and communicative when providing details of her personal life. Plaintiff was felt to comprehend all aspects of the evaluation. (AR 419). Plaintiff readily supplied information regarding her personal life. She could recall her address, telephone number, birth date, and her social security number. (AR 419-20). However, when answering test questions, Plaintiff was noted to have psychomotor slowing, slowness in her verbal response time, and reported problems with her memory. (AR 419-20). Plaintiff could not answer simple test questions. Dr. Borden thought that Plaintiff's answers appeared to be "deliberatively non-responsive" at times. (AR 419). Plaintiff claimed that she did not know the shape of a ball, nor what a thermometer was. Dr. Borden noted that "[t]his is information that most intellectually challenged people know." (AR 420).

Dr. Borden thought that Plaintiff's affect was appropriate and her concentration was adequate. Her insight was average. Although Plaintiff claimed to do little housework, Dr. Borden noted that Plaintiff indicated that she cared for her two children. Plaintiff also claimed that she was unable to handle finances, but she was able to describe how much money she previously received in Social Security benefits and was well aware of how much money her husband received in disability benefits. (AR 420).

During the tests, Plaintiff claimed to be not able to follow simple instructions. However, Dr. Borden noted that Plaintiff was able to respond to more complex tasks and answer more complex personal questions. (AR 420-21). Plaintiff scored a verbal I.Q. score of 63, a

performance I.Q. score of 61, and a full scale I.Q. score of 58.  These scores indicated intellectual functioning in the deficient range. However, Dr. Borden did not believe that these scores were valid.  She believed that Plaintiff's adaptive level of functioning appeared to be much higher than the scores indicated since Plaintiff appeared to be able to maintain a household and take care of her children.  Dr. Borden also believed that Plaintiff did not set forth adequate effort on other tests, such as the Trails test.  (AR 421).

Dr. Borden concluded that Plaintiff was estimated to be functioning in the borderline to low-average intellectual range.  No symptoms of depression were noted during the evaluation.  Dr. Borden thought that Plaintiff was competent to manage funds on her own behalf.  Plaintiff was able to function in a work-related setting; was able to persist at simple, repetitive tasks and follow two-part instructions without requiring personal supervision; was aware of and could take appropriate precautions regarding normal hazards; was able to interact adequately with peers, as well as with authority figures; and probably was able to maintain a regular schedule.  (AR 422).

**D. Medical Experts' Testimonies**

At the second hearing, two separate medical experts testified after reviewing Plaintiff's medical records.  Dr. Harvey L. Alpern, an internist (AR 342), testified that Plaintiff had the medically determinable impairment of a history of seizures.  (AR 582).  He stated that the seizures appeared to be more frequent in the 1980's.  In the last two years, Dr. Alpern noted that the history of seizures was

10

mentioned in the medical records, but that there appeared to have been no actual episodes.   The records only noted that Plaintiff was still taking seizure medication.  (AR 582).  Dr. Alpern also noted that there was some mention of hand problems by Dr. Nguyen, but that there was no other reports about hand numbness anywhere in the medical records.  (AR 582).

Dr. Alpern did not think that Plaintiff's impairments met or equaled a listing.   Dr. Alpern further stated that the only work restrictions Plaintiff should be assessed was a restriction from exposure to dangerous equipment or heights, or other seizure precautions that were appropriate such as driving.  (AR 582-83).  At the conclusion of his testimony, Dr. Alpern confirmed that he had taken into account the limitations imposed by Dr. Nguyen in the January 2000 medical source statement in reaching his opinion.  (AR 583).

Next, Dr. Charles Agler, a psychiatrist (AR 336-39), testified as a medical expert.  When asked what medically determinable impairments Plaintiff had, Dr. Agler stated: "There is a possibility that [is] severely in doubt with many possibilities present."  (AR 584).  Dr. Agler explained that Plaintiff could be suffering from factitious disorder, conversion disorder, or depression with psychosis.  (AR 584). Dr. Agler doubted that Plaintiff had a traumatic brain injury because her MRI was normal and her CAT scans and EEG's were also normal.  (AR 584).  Dr. Agler felt that depression with psychosis was also doubtful because she was getting "such moderate treatment."  (AR 585).  Dr. Agler thought that there was poor documentation of major depression with \\

11

psychosis and considerable evidence of "either conscious or unconscious distortion of findings on the part of [Plaintiff]." (AR 586).

Regarding Plaintiff's seizure complaints, Dr. Agler doubted whether Plaintiff suffered from true seizures. (AR 585). Dr. Agler noted that the records from St. Mary's Hospital in 1987 indicated that she had displayed very dramatic seizure like activity. However, an EEG performed immediately afterwards was "perfectly normal," which would be very unusual if it was a true seizure, but "more in line with a conversion disorder." (AR 585). Dr. Agler described a conversion disorder as a situation in which a patient exhibited the signs and symptoms of a physical disorder, but where there was a complete lack of supporting evidence to establish a physical disorder. A conversion disorder could include seizures and psychiatric disorders like depression. Dr. Agler explained that the basis of the disorder was marked neurotic conflict and was the patient's way of expressing unconscious conflict through physical signs and symptoms. (AR 588-89). In response to the question from Plaintiff's attorney of whether Plaintiff should be tested for conversion disorder, Dr. Agler recommended further testing with psychological tests and the Rey's Scale. (AR 589).

In his opinion, Dr. Agler did not think that Plaintiff met or equaled the listings on a psychiatric basis. (AR 586). "[A]t the worst," Dr. Agler thought that Plaintiff could perform simple, unskilled work or simple, repetitive work. He thought that Plaintiff was "probably capable of substantially more than that," but that she was capable of "at least" that. (AR 586-87). Dr. Agler thought the

12

limitation to simple work was probably valid from Plaintiff's filing date of the SSI application, September 14, 1998.  (AR 588).

With regard to Dr. Lachica's opinions of Plaintiff's limitations, Dr. Agler noted that Dr. Lachica's notes said the "same thing over and over and over again" and that Plaintiff received the same treatment for almost two years.  (AR 587).  Dr. Agler thought that Dr. Lachica's notes were inconsistent with the findings by all other doctors.   In his experience, if a patient was truly depressed, the depression would be frequently noted by other doctors, even if they did not specialize in mental health.   As a specific example, he pointed out that Dr. Borden did not note depression.  (AR 587).  Furthermore, Dr. Agler thought that Plaintiff's symptoms were not consistent with psychosis or depression. (AR 587-88).

**E. <u>Plaintiff's Testimony</u>**

At the first hearing, Plaintiff testified that she could not work because of her seizures and problems with her arms and shoulders.  (AR 600).  Although she had young children, she testified that she did not take care of them.  She stated that they could take care of themselves. Plaintiff claimed that she did not do any cooking, but could help wash the vegetables when she did not feel dizzy.  (AR 603-04).  She spent the day cleaning if she felt well, learning some English from her children, knitting a little bit, and laying down when she did not feel well.  (AR 604).

\\

\\

13

At the second hearing, Plaintiff testified that she heard voices. (AR 590).  She stated that a friend committed suicide and she was afraid that she would commit suicide as well.  (AR 590).  When asked how far she could walk, Plaintiff claimed that she could only walk a block before she had to stop and rest.  (AR 590).  She could also stand for only half an hour.  (AR 590).  Plaintiff testified that she could not do any housework and that she just wanted to commit suicide.  (AR 591). She did not read or watch TV.  (AR 592).  She complained that her husband screamed and yelled at her.  She spent her time taking her medicine and trying to get away from her husband.  (AR 591-92).  She claimed that she took sleeping pills, but that she still could not sleep more than two hours a night.  (AR 592).

### F.  The Vocational Experts' Testimonies

At the first hearing, Mr. George Langston testified as a vocational expert ("VE").  He was asked to assume an individual who had no exertional limitations, but who was limited to not working around heights; no moving machinery; no driving; no operating motor vehicles; and no work in any situation where dizziness or seizures would be dangerous.  The individual was also limited to simple, repetitive tasks of a low stress nature, which was defined as requiring no responsibility for the health, safety, or production of others.  Furthermore, the individual should have no public contact and no more than average production and pace.  (AR 605).  Mr. Langston testified that the job of a packager was an unskilled and simple job that such an individual could perform.  (AR 605).  With the addition of a limitation to light work, \\

14

Mr. Langston stated that such a person could perform the job of a packager or assembler. (AR 606).

Mr. E.T. Kurata testified at the second hearing as a vocational expert. Mr. Kurata stated that Plaintiff had no relevant past work experience. (AR 593). The ALJ based the hypothetical on the testimonies of the medical experts, Dr. Alpern and Dr. Agler, and asked the VE to assume an individual with a seizure restriction and limitation to simple work. (AR 594). Mr. Kurata found multiple jobs that could be performed by a person under those restrictions. The individual could perform work as an assembler of fishing floats, which was unskilled, entry-level, simple and repetitive work. (AR 594). The individual could also work as a roast tier in the sporting goods manufacturing industry, a bait packer, a box bender, or a day worker in domestic service. (AR 595).

## THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents him from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months. <u>Reddick v. Chater</u>, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work he previously performed and incapable

---

[3]   Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. § 404.1510.

of performing any other substantial gainful employment that exists in the national economy.  Tackett v. Apfel, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry.  20 C.F.R. § 404.1520.  The steps are:

(1)   Is the claimant presently engaged in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.

(2)   Is the claimant's impairment severe?  If not, the claimant is found not disabled.  If so, proceed to step three.

(3)   Does the claimant's impairment meet or equal one of a list of specific impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1?  If so, the claimant is found disabled.  If not, proceed to step four.

(4)   Is the claimant capable of performing his past work?  If so, the claimant is found not disabled.  If not, proceed to step five.

(5)   Is the claimant able to do any other work?  If not, the claimant is found disabled.  If so, the claimant is found not disabled.

Tackett, 180 F.3d at 1098-99; see also Bustamante v. Massanari, 262 F.3d 949, 953-54 (9th Cir. 2001) (citing Tackett); 20 C.F.R. § 404.1520(a)(4).
\\
\\

The claimant has the burden of proof at steps one through four, and the Commissioner has the burden of proof at step five. Bustamante, 262 F.3d at 953-54 (citing Tackett). Additionally, the ALJ has an affirmative duty to assist the claimant in developing the record at every step of the inquiry. Id. at 954. If, at step four, the claimant meets her burden of establishing an inability to perform past work, the Commissioner must show that the claimant can perform some other work that exists in "significant numbers" in the national economy, taking into account the claimant's residual functional capacity,[4] age, education, and work experience. Tackett, 180 F.3d at 1098, 1100; Reddick, 157 F.3d at 721; 20 C.F.R. § 404.1520(g). The Commissioner may do so by the testimony of a vocational expert or by reference to the Medical-Vocational Guidelines appearing in 20 C.F.R. Part 404, Subpart P, Appendix 2 (commonly known as "the Grids"). Osenbrock v. Apfel, 240 F.3d 1157, 1162 (9th Cir. 2001) (citing Tackett). When a claimant has both exertional (strength-related) and nonexertional limitations, the Grids are inapplicable, and the ALJ must take the testimony of a vocational expert. Moore v. Apfel, 216 F.3d 864, 869 (9th Cir. 2000) (citing Burkhart v. Bowen, 856 F.2d 1335, 1340 (9th Cir. 1988)).

**THE ALJ'S DECISION**

At the first step of the sequential evaluation, the ALJ observed that Plaintiff had not engaged in substantial gainful activity since the alleged onset date of her disability. (AR 29). Next, the ALJ found

---

[4]   Residual functional capacity is "the most [one] can still do despite [her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. § 404.1545(a).

that Plaintiff's history of seizures and depressive disorder were "severe." However, he found that Plaintiff's impairments did not meet or equal any of the impairments appearing in the "Listing of Impairments" set forth in 20 C.F.R. Part 404, Subpart P, Appendix 1, Regulation No. 4. (AR 29).

The ALJ found that Plaintiff had the residual functional capacity to perform "simple work with restriction from exposure to dangerous equipment or heights or other machinery, including driving." (AR 29). Plaintiff had no exertional limitations. (AR 29). In analyzing Plaintiff's residual functional capacity, the ALJ considered Plaintiff's allegations regarding her limitations but did not find them totally credible. (AR 29).

Under step four, the ALJ found that Plaintiff had no relevant past work. (AR 29). In step five, based on Plaintiff's RFC and on the testimony of the vocational expert, the ALJ concluded that Plaintiff could perform work existing in significant numbers in the national economy, including the jobs of assembler of fishing floats, roast tier, bait packer, box bender, and day worker in domestic service. (AR 28-29). Accordingly, the ALJ determined that Plaintiff was not disabled at any time through the date of the decision. (AR 29).

## STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), a district court may review the Commissioner's decision to deny benefits. The court may set aside the Commissioner's decision when the ALJ's findings are based on legal error

or are not supported by substantial evidence in the record as a whole. <u>Aukland v. Massanari</u>, 257 F.3d 1033, 1035 (9th Cir. 2001) (citing <u>Tackett</u>, 180 F.3d at 1097); <u>Smolen v. Chater</u>, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing <u>Fair</u>, 885 F.2d at 601).

"Substantial evidence is more than a scintilla, but less than a preponderance." <u>Reddick</u>, 157 F.3d at 720 (citing <u>Jamerson v. Chater</u>, 112 F.3d 1064, 1066 (9th Cir. 1997)). It is "relevant evidence which a reasonable person might accept as adequate to support a conclusion." <u>Id.</u> (citing <u>Jamerson</u>, 112 F.3d at 1066; <u>Smolen</u>, 80 F.3d at 1279). To determine whether substantial evidence supports a finding, the court must "'consider the record as a whole, weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" <u>Aukland</u>, 257 F.3d at 1035 (citing <u>Penny v. Sullivan</u>, 2 F.3d 953, 956 (9th Cir. 1993)). If the evidence can reasonably support either affirming or reversing that conclusion, the court may not substitute its judgment for that of the Commissioner. <u>Reddick</u>, 157 F.3d at 720-21 (citing <u>Flaten v. Sec'y</u>, 44 F.3d 1453, 1457 (9th Cir. 1995)).

**DISCUSSION**

Plaintiff argues that the ALJ erred in rejecting the mental limitations imposed by Plaintiff's treating physician, Dr. Lachica. (Jt. Stip. at 4). The Court disagrees and finds that the ALJ properly considered the opinions of Dr. Lachica and rejected them with specific and legitimate reasons.

\\

\\

1  Although the treating physician's opinion is entitled to great
2  deference, it is "not necessarily conclusive as to either the physical
3  condition or the ultimate issue of disability." Morgan v. Comm'r of
4  Soc. Sec. Admin., 169 F.3d 595, 600 (9th Cir. 1999). Where the treating
5  doctor's opinion is not contradicted by another doctor, it may be
6  rejected only for "clear and convincing" reasons. Lester v. Chater, 81
7  F.3d 821, 830 (9th Cir. 1995) (as amended). Where the treating
8  physician's opinion is contradicted by another doctor, as it is here,
9  the ALJ may reject this opinion by providing "specific and legitimate"
10  reasons supported by substantial evidence in the record for doing so.
11  Id.

12

13  In this case, the ALJ provided many reasons for rejecting Dr.
14  Lachica's opinions. First, the ALJ noted that he credited Dr. Agler's
15  critique of Dr. Lachica's assessment. (AR 25). During the hearing, Dr.
16  Agler wondered why Plaintiff was getting "such moderate treatment" if
17  she was as psychotic and depressed as Dr. Lachica claimed. (AR 585).
18  He also wondered why Plaintiff received the same treatment from Dr.
19  Lachica over the course of two years and why no other doctor observed
20  the same severity of depression as Dr. Lachica did. (AR 587). Dr.
21  Agler gave his opinion that Plaintiff could perform at least simple work
22  after reviewing the entire record and specifically supporting his
23  opinion with references to the findings made by the neurological
24  consultative examiner, Dr. Subhas, and the psychological consultative
25  examiner, Dr. Borden. (AR 584-87). Reports of a nonexamining advisor
26  such as Dr. Agler "need not be discounted and may serve as substantial
27  evidence when they are supported by other evidence in the record and are
28  consistent with it." See Andrews v. Shalala, 53 F.3d 1035, 1041 (9th

Cir. 1995).   To the extent that there was conflict between medical opinions, it was solely the province of the ALJ to resolve the conflict. Id. at 1041.

Second, the ALJ noted that Dr. Lachica's assessments were not supported by her own psychiatric treatment notes, which generally showed improvement with psychotropic medications.  Plaintiff contends that Dr. Lachica's notes repeatedly show that Plaintiff was suffering from a severe disability.   While Dr. Lachica did note some periods of improvement, Plaintiff contends that when taken as a whole, Dr. Lachica's notes showed continued severe depression.  (Jt. Stip at 4-5). The Court's own review of Dr. Lachica's notes reveals that while Dr. Lachica consistently noted depression, anxiety, and insomnia, as well as periodic feelings of suicidal thoughts, Dr. Lachica also frequently noted improvement with medication.  (See, e.g., 509, 511, 514).  The ALJ is permitted to reject a treating physician's opinion when that opinion is contradicted by or inconsistent with the treatment reports.   See Rollins v. Massanari, 261 F.3d 853, 856 (9th Cir. 2001) (physician claimed that the plaintiff was disabled but treatment notes indicated that the plaintiff had improved).

Third, the ALJ pointed out that Dr. Lachica's treatment of Plaintiff consisted only of medication management since January 2001. The ALJ further pointed out that there was no evidence of aggressive individual or family therapy since Plaintiff began treating with Dr. Lachica, even after the ALJ gave Plaintiff thirty additional days to submit additional treating records.  The ALJ observed that Dr. Lachica continued to treat Plaintiff with only medications despite her opinion

1  that Plaintiff was disabled.  The ALJ reasoned that if Plaintiff were as

2  limited as assessed by Dr. Lachica, the doctor would have referred

3  Plaintiff to another mental health professional who might have been able

4  to provide a more effective treatment regimen.  (AR 25).  This reason

5  given by the ALJ is also specific and legitimate.  See Rollins, 261 F.3d

6  853, 856 (9th Cir. 2001) (ALJ permissibly rejected treating physician's

7  opinion when opinion was inconsistent with the treatment reports and

8  physician prescribed a conservative course of treatment).  Cf. Johnson

9  v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995) (conservative or

10  infrequent treatment may be used by the ALJ to refute the plaintiff's

11  allegations of disabling pain).

12

13      Fourth, it is difficult to determine the basis of Dr. Lachica's

14  opinions because, as the ALJ noted in her decision, Dr. Lachica's

15  treatment notes and her opinions did not contain any mental status

16  examinations or psychological testing which would allow longitudinal

17  comparisons of Plaintiff's functioning.  (AR 25).  The ALJ is not

18  required to accept a medical opinion that is conclusory and inadequately

19  supported by medical findings.  Batson v. Comm'r of Soc. Sec., 359 F.3d

20  1190, 1195 (9th Cir. 2004) (ALJ may discredit treating physicians'

21  opinions that are conclusory, brief, and unsupported by the record as a

22  whole, or by objective medical findings).  See also Crane v. Shalala, 76

23  F.3d 251, 253 (9th Cir. 1996) (ALJ properly rejected doctor's opinion

24  because they were check-off reports that did not contain any explanation

25  of the bases of their conclusions); Murray v. Heckler, 722 F.2d 499, 501

26  (9th Cir. 1983) (expressing preference for individualized medical

27  opinions over check-off reports).

28  \\

1    Finally, the ALJ thought that without such objective examinations
2    and testing, Dr. Lachica's assessment lacked objectivity and appeared to
3    be based primarily on Plaintiff's subjective allegations and/or possible
4    sympathy to Plaintiff's SSI claim. (AR 25). The ALJ observed that such
5    motives were difficult to substantiate, but that it was especially
6    likely in situations such as the current case where the treating
7    physician submitted extreme assessments shortly before or after the
8    hearing that were not supported by her treatment records. (AR 25). The
9    record contains substantial evidence to support the ALJ's reasoning.
10   The hearing before ALJ Donsbach was on April 6, 2004. (AR 578). Dr.
11   Lachica's letter to the ALJ was on February 13, 2004, and her mental
12   assessment was completed just two weeks before the hearing, on March 23,
13   2004. (AR 501, 520). In the letter Dr. Lachica wrote to the ALJ, the
14   psychiatrist pointed out that Plaintiff previously received disability
15   benefits and required public assistance, cash, and Medi-cal "for
16   survival." (AR 501).

18   Furthermore, the ALJ was allowed to reject Dr. Lachica's opinion
19   for being based on Plaintiff's subjective complaints. The ALJ is
20   allowed to reject an opinion that was based, at least in part, on
21   Plaintiff's subjective complaints once those complaints themselves have
22   been properly discounted. See Andrews, 53 F.3d at 1043 ("[A]n opinion
23   of disability premised to a large extent upon the claimant's own
24   accounts of his symptoms and limitations may be disregarded, once those
25   complaints have themselves been properly discounted."). The ALJ
26   properly discounted Plaintiff's subjective complaints, noting that
27   Plaintiff's treatment consisted of only routine office visits for
28   medication maintenance and that Plaintiff's performance in the

1   consultative psychological evaluation was seriously questionable.   (AR
2   27).   Accordingly, the ALJ's reasons to reject Dr. Lachica's opinions
3   were specific and legitimate, and they were supported by substantial
4   evidence in the record.

5

6        In the Joint Stipulation, Plaintiff raises a brief contention that
7   the ALJ failed to properly develop the record with respect to a possible
8   conversion disorder.   (Jt. Stip. at 5-6, 9).   Dr. Agler testified that
9   he thought it was possible that Plaintiff could be suffering from a
10  conversion disorder because he did not believe Plaintiff suffered from
11  true seizures.   (AR 584).   He recommended that she receive further
12  psychological testing.   (AR 589).

13

14       The mere existence of an impairment is insufficient proof of
15  disability.   Plaintiff bears the burden of proving that the impairment
16  is disabling.   See Matthews v. Shalala, 10 F.3d 678, 680 (9th Cir.
17  1993).   In this case, Plaintiff has provided no evidence that her
18  undiagnosed conversion disorder is disabling.   Furthermore, Dr. Agler's
19  opinion that Plaintiff may have a "possible" conversion disorder need
20  not be accepted because it is not supported by other evidence in the
21  record.   See Andrews, 53 F.3d at 1042 (nonexamining physician's opinions
22  "with nothing more" cannot constitute substantial evidence).   Moreover,
23  regardless of whether Plaintiff may be suffering from a conversion
24  disorder, Dr. Agler still opined that Plaintiff was capable of
25  performing at least simple work.   Thus, he provided an opinion regarding
26  Plaintiff's limitations even after taking into account the possibility
27  of a conversion disorder.
28  \\

Finally, the ALJ kept the record open for thirty additional days for Plaintiff's attorney to submit additional records. (AR 25). At the hearing, Plaintiff's attorney noted that Plaintiff may have a conversion disorder (AR 596), but he did not seek further testing or obtain a medical opinion regarding that impairment.  Any duty the ALJ had to develop the record regarding the conversion disorder was discharged when she kept the record open.  See Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001) (ALJ may discharge his duty in several ways, including:  subpoenaing the claimant's physicians, continuing the hearing, or keeping the record open after the hearing to allow supplementation of the record).

## CONCLUSION

Consistent with the foregoing, IT IS ORDERED that Judgment be entered AFFIRMING the decision of the Commissioner and dismissing this action with prejudice.  The Clerk of the Court shall serve copies of this Order and the Judgment on counsel for both parties.

DATED: September **20**, 2006.


_____
SUZANNE H. SEGAL
UNITED STATES MAGISTRATE JUDGE

25